# JAMES McCADDIN *vs.* LOUISA H. McCADDIN.

*Husband's duty to support wife. Alimony; discretion of Chan-
cellor; review by Court of Appeals; alimonies where
no divorce prayed; decree always subject to modi-
fication. Judicial notice. Cost of living.*

A Court of Chancery has the power to entertain an applica-
tion for alimony although no decree of divorce is asked for.
p. 567

It is not a sufficient defence to a suit for alimony for the hus-
bond merely to assert that he is able and willing to support
the plaintiff.                                    pp. 570-571

It is not for a Court unnecessarily to widen a breach between
a husband and wife by its orders or decrees.          p. 571

But the law demands of the husband that he shall support his
wife if he has the ability so to do; and if they are sepa-
rated by his act and not by the fault of the wife he must
make reasonable provision for her.                    p. 571

Courts may take judicial notice of such things as are, or should
be, generally known in their several jurisdictions.    p. 571

In an application for alimony Courts may consider the high
cost of living.                                       p. 571

It is the duty of the Court, in determining the amount of
alimony to be decreed, to inquire into the circumstances of
the parties, not only as to the financial condition of the
husband, but also as to his ability to earn the money.
p. 572

Although the Court of Appeals has the right to view the
amount of alimony fixed by the lower Court, it should not
disturb the large discretion vested in the Chancellor unless
it is thoroughly satisfied that there is error in the amount
named by him.                                         p. 572

When a decree provides for the payment of so much per week
as permanent alimony, it is subject to the limitations fixed
by law and can only continue during the joint lives of the
husband and wife, and while they live apart.          p. 573

When a decree *a mensa et thoro* is granted, or when there is
an allowance for alimony without divorce, the decree may
be modified at any time, as circumstances may require, sub-
ject to well established rules.                        p. 574

*Decided November 22nd, 1911.*

Appeal from the Circuit Court No. 2 of Baltimore City
(STOCKBRIDGE, J.).

The cause was argued before BOYD, C. J., PEARCE,
BURKE, THOMAS, PATTISON and URNER, JJ.

*Warren A. Stewart* (with whom was *Hyland P. Stewart*
on the brief), for the appellant.

*Burdette B. Webster* (with whom were *Charles F. Harley*
and *John B. A. Wheltle* on the brief), for the appellee.

BOYD, C. J., delivered the opinion of the Court.

This is an appeal from a decree allowing the appellee
seven dollars and fifty cents per week as permanent alimony
and also counsel fees.   The bill does not pray for a divorce,
but only for temporary. alimony, *pendente lite,* permanent
alimony and counsel fees.   There is no question in this State
about the power of a Court of Chancery to entertain an appli-
cation by a wife against her husband for alimony, although
she does not ask for a decree of divorce.   As recently as
*Taylor* v. *Taylor,* 108 Md. 129, such a suit was entertained,
and there are a number of other decisions by us and our
predecessors, including the late one of *Stewart* v. *Stewart,*
105 Md. 297, in which the right is fully recognized.   We do
not deem it necessary to quote at much length the testimony

in the case, but in our judgment it sustains the appellee's contention that the appellant had abandoned her and failed to support her. It is a peculiarly sad case, as the parties' have been married over forty years and the appellant has met with financial reverses which undoubtedly lessened his income very materially. The wife was evidently an economical woman, as her savings out of money earned by the husband and turned over to her in their early married life furnished the means by which he established what was for some years a very prosperous business. At one time his habits were such as would necessarily make the home an unhappy one, but he seems to have corrected them. We refer. to them in connection with the fact brought out in the testimony that some years ago the appellee left the bedroom occupied by her and her husband and slept in one in the third story. It was explained by the wife that when she first occupied that room her husband would sometimes be away for weeks and frequently all night, or until very late at night, and as her daughter slept in that story she moved up there for protection and company. Although the evidence of the husband is in many particulars in conflict with the material parts of the wife's testimony she is sustained by that of her daughter. It must be admitted that the appellant's treatment of his wife on many occasions was, to speak mildly, not to be commended, and possibly the appellee was not always entirely free from blame, as a more considerate course might at times have avoided unhappy differences.

The appellant contends that he was ready and willing to support the appellee, and still is if she will live with him on a farm in Baltimore county which he speaks of as his, but which, according to the evidence, belongs to Mr. Furst, who is willing to let the appellant have it on payment of what is due by him. But while he alleges that he offered to take his wife to the farm, her testimony and that of their daughter is to the contrary. He wrote at the bottom of a notice of expiration of an insurance policy on the furni-

ture, "I ain't going to have this renewed because I am going
to move and I expect to move this week." The daughter
was asked, "Do you remember the circumstances under which
your father left home," and answered, "He always would
threaten, every little disturbance he would threaten he was
going to get another home, and finally he went to the farm,
and we did not know he was going until the wagon drove
up and he moved some things to the farm, but he left a
little note." The above is the note referred to. She also
testified: "Mamma said, what am I going to do? He said,
you can go to your sister's or work like I am doing. My
mother's sister lives a few doors below. She is a widow."
The appellee testified to the same effect, and she also said
on cross-examination, in answer to the question, "When he
left you to go to the farm did Mr. McCaddin ask you to
come with him and say that he would provide a house for
you there?" "No, sir; he never asked me to go at all. He
just made arrangements to go himself, and he has not been
out on it himself hardly all the time. We would not have
had a home out there if we wanted." So the preponderance
of the testimony shows that he did not offer to take his
wife with him, but left her to take care of herself. Accord-
ing to the evidence offered in his behalf, it is perfectly evi-
dent that he knows but little about farming and the farm is
run down for want of proper attention to it, although there
is a tenant on it, and it is doubtful whether he could support
himself and wife on it, even if Mr. Furst continued to
indulge him as he has done.

But it is contended that as he expressed his readiness and
willingness to support her, and as she testified she was will-
ing to go to the farm and make that her home, or if he
opened a store on Gay street as he spoke of doing, that she
was willing to live over the store, alimony should have been
refused. It would be an easy way of avoiding the obliga-
tion to support his wife which rests on a husband, if when
a bill for alimony is filed the mere assertion that he is ready

and willing to support her, if she will live with him, is to satisfy the requirements of the law. There is not a particle of evidence in the case tending to show that he had made any effort, after he left, to have her move to the farm, or that he had, after that time, offered to provide her a home there or elsewhere, and his evidence that he had so offered before he left is overcome by that of his wife and daughter. If, however, both are now willing to live together, and they do so, the alimony can cease, as will be seen later.

It is true that a Court should be careful not to unnecessarily widen a breach between husband and wife by its orders and decrees, but it is equally true that the law demands of a husband that he support his wife, if he has the ability to do so, and that if they are separated by *his,* and not by *her* fault he must make reasonable provision for her. Being satisfied by the evidence that the appellant has, within the meaning of the law, abandoned the appellee, the next question is, whether the amount fixed by the decree is reasonable. If the Court is permitted to take judicial notice of such things as "are or should be generally known in their respective jurisdictions," we will not extend that rule unduly if we recognize the fact that the cost of living is now considerably in excess of what it used to be. If then the wife of a man who a few years ago was worth forty or fifty thousand dollars, if not more, is allowed seven dollars and a half a week, such an allowance cannot be said to be unreasonable, unless the husband has lost his fortune and is so incapable of earning a living for himself and wife as to make that sum out of proper proportion to his income or capacity to earn. Conceding that the appellant no longer has any interest in the farm beyond the privilege of purchasing it at a figure which he says is more than it is worth (although that is the farm he said he was ready to take his wife to), he has some equity in two houses in Baltimore, and since this proceeding was commenced received one dividend from the receivers of the company, which was once so successful, of $3,293.00, and he expects more.

He further testified that he was in good health, and "I could do a good bit of work if I had it to do," and in answer to the question, "Nobody in this town understands the picture frame mirror business better than you do?" he replied, "Well, in the cheap goods there is, but I do not think there is anybody in the City of Baltimore understands the fine work of gilding as I do." He said gilding is a lucrative occupation, "plenty of money in it," although he also said that he did not have the capital necessary to make it a success. Apparently he is, however, capable of making a fair living, if he chooses to do so. He received for several years as much as $3,500.00 a year, and up to April, 1910, received $25.00 a week. So, without further quoting from the testimony, we are not prepared to say the amount named in the decree below is so unreasonable as to justify our disturbing it. It is the duty of the Court in determining the amount of alimony to inquire into the circumstances of the parties, not only as to the financial condition of the husband, but his ability to earn money, and, although this Court has the power to review the amount fixed by the lower Court (*Chappell* v. *Chappell,* 86 Md. 532), it should not disturb the large discretion vested in the chancellor unless it is thoroughly satisfied that there has been error in respect to the amount named.

Without discussing it, we will add that the allegation in the answer that the wife has considerable means of her own is not sustained. It is true that some deposits are so held that she might get them or some part of them, but they belong to her daughter and were only intended by the daughter to make provision for her mother in case the latter survived her.

We will now consider the point made by the appellant as to the form of the decree, a discussion of which will also reflect in some respects upon the question of amount. The decree is that the defendant pay the plaintiff, the sum of seven and one-half dollars ($7.50) per week as permanent alimony, accounting from the eighth day of December,

1910." It was argued that that was reversible error because it was not limited to any time or circumstances, but was practically a decree requiring the payment indefinitely, or as said in the brief of appellant "forever"—that it in effect prevented the parties from living together, "and puts a premium on the wife for holding out against her husband, and imposes a penalty on him which he cannot possibly stand up to." It is said in *Wallingsford* v. *Wallingsford,* 6 H. & J. 485, a leading case in this State, and frequently referred to elsewhere, that "alimony is a maintenance afforded to the wife, where the husband refuses to give it, or where from his improper conduct compels her to separate from him. It is not a portion of his real estate, to be assigned to her in fee simple, subject to her control, or to be sold at her pleasure, but a provision for her support, to continue their joint lives, or so long as they live separate. *Upon the death of either, or upon their mutual consent to live together, it ceases."*

When, therefore, this decree provided for the payment of so much a week as permanent alimony, it was subject to the limitations fixed by law, and could only continue during the joint lives of the husband and wife, while they live apart. There has been some diversity of opinion between the Courts of different jurisdictions as to how far a final decree, allowing permanent alimony, can be modified after the decree has become enrolled, but in this case there can be no difficulty. These parties have not been divorced, either *a mensa et thoro* or *a vinculo matrimonii,* but, being separated under such circumstances as to require the husband to support the wife, provision for her support is made, but only while they are so separated. In 2 *Am. & Eng. Ency of Law* (2 Ed.) 135, the rule is thus stated: "The amount of alimony allowed *pendente lite,* or the allowance made the wife as permanent alimony, upon a decree of divorce *a mensa et thoro,* may, when the circumstances justify it, be increased or diminished as the case demands. So also in case of an allowance of alimony without divorce. But in the case of a decree *a*

*vinculo* the award is absolute, and cannot be altered after the expiration of the term or the time in which a new trial may be had, unless in the decree the Court reserves the right to do so, or unless the power to subsequently modify the decree is given expressly by statute." See 14 *Cyc,* 784; 1 *Ency. of Pl. and Pr.* 430. It is also said in 2 *Am. & Eng. Ency. of Law,* 139, that "The allowance of alimony being, in its nature, a provision made by the husband for his wife's support, it necessarily ceases upon the death of either party, and unless expressly authorized by statute, a decree granting permanent alimony to continue during the natural life of the wife is erroneous," and on page 140 it is said: "In reason, if the wife returns to her husband after a divorce *a mensa et thoro,* and is reconciled to him, she cannot continue to have alimony." That being so when there is a divorce *a mensa et thoro, a fortiori* it would be so when there is no divorce.

It seems, therefore, to be well settled that at least when a divorce *a mensa et thoro* is granted, or when there is an allowance of alimony without divorce, the decree can be modified as circumstances may require, subject, of course, to some well established rules, and in this State alimony ceases upon the death of either party, or upon their living together. The decree as granted must, therefore, be construed to be subject to those well established limitations, although they are not in terms embodied in it. As the appellant is now of an age which may make it more difficult each year for him to earn a living it may become necessary to make some modification of the decree as to the amount, but that must depend upon future circumstances and can not be anticipated by us.

As both the appellant and the appellee have sworn that they are willing to live together, it is to be hoped that such frame of mind will be permanent, and not merely *pendente lite,* and that they will settle the question of alimony themselves by living together. When husband and wife reach or approach the age of three score years and ten they ought to

realize that a separation will come soon enough without any assistance from them. The appellant and appellee are still man and wife, and a genuine reconciliation, based on an honest determination to forgive and forget, would perhaps prove to be the best support for both of them in their old age. *We* cannot decree that they live together, but *they* can.

> *Decree affirmed, the appellant to pay the costs.*